PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHIMOS PANTELERIS, | ) | |
| | ) | CASE NO. 4:14cv477 |
| Plaintiff/Petitioner, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| AALISON PANTELERIS, *f/k/a Aalison* | ) | |
| *Denton*, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant/Respondent. | ) | **ORDER** [Regarding ECF No. 1] |

Before the Court is the Complaint and Petition for Return of Children filed by Anthimos

Panteleris against Aalison Panteleris pursuant to the Convention on the Civil Aspects of

International Child Abduction (the "Hague Convention") and the International Child Abduction

Remedies Act ("ICARA"), 42 U.S.C. § 11601, *et seq*. ECF No. 1. The Court has been

informed, having reviewed the petition and having held an expedited hearing. For the reasons

explained below, the Court grants the petition and orders that the children of Anthimos and

Aalison Panteleris be returned to Australia.

## I. Background

Petitioner Anthimos, *a/k/a Michael*, is a citizen and resident of Australia. ECF No. 1 at 1,

¶1. In 2005, while in the United States, Anthimos met and married Respondent Aalison, a

United States citizen. *Id*. at 3, ¶10. Their first child, B.P., was born in the United States in

November 2006. *Id*. at ¶11. In March 2007 the family moved to Australia. *Id*. at ¶12. Their

second child, H.P., was born in Australia in November 2008. *Id*. at ¶13. Their third child, Z.P.,

was born in Australia in December 2011. *Id*. at ¶14. All three children are citizens of the United

(4:14cv477)

States and Australia.  *Id.* at 2, ¶3.  The Court refers to the immediate family of Anthimos and

Aalison Panteleris as the "Panteleris family."  When "family' is used without being immediately

preceded by Panteleris, the Court is referring to either the family of Anthimos or Aalison.

The Panteleris family lived in Australia for five years.  *Id.* at ¶15.  When they first

arrived, they lived with Anthimos's family in Melbourne.  They later moved to Hamilton, a town

five hours from Melbourne by public transportation.  They moved back to Melbourne in 2011

and into a house owned by Anthimos's grandmother.[1]  They lived with Anthimos' family in the

grandmother's house for one year, until March 2012 when the Panteleris family traveled to the

United States.  At that time, the children were ages five, three, and four months.  During the

Panteleris family's time in Australia, Aalison was the primarily breadwinner and Anthimos was

the primary caregiver of the children.

In March 2012, the Panteleris family arrived in Hawaii, where they remained for

approximately four weeks.[2]  In April 2012, the Panteleris family came to Salem, Ohio, Aalison's

hometown.  *Id.* at 6, ¶27.  After briefly moving in with Aalison's mother, the couple entered into

a 12-month lease on an apartment in the Northern District of Ohio.  *Id.*

Anthimos describes the Panteleris family's trip to the United States as "an extended,

---

[1]  It is not clear from the record whether this is the same Melbourne home that the
Panteleris family lived in upon their arrival in Australia.

[2]  Paragraph 24 of the Petition alleges that "Petitioner and Respondent decided to take an
extended, yearlong holiday in the United States, agreeing that the entire family would stay for 6
months, and that, if necessary, Petitioner would then return to Australia to supplement the
family's income while the rest of the family remained in the United States for an additional six
months."

(4:14cv477)

yearlong holiday in the United States, [with he and Aalison] agreeing that the entire family would

stay for 6 months, and that, if necessary, Anthimos would then return to Australia to supplement

the family's income while the rest of the family remained in the United States for an additional 6

months." *Id.* at 5, ¶24.  At the Hearing, Anthimos testified that the reason for the trip was to

allow Aalison to spend time with her family.  He explained that, apart from a month-long visit to

Ohio in 2008 after the death of her father, Aalison had not seen her family since she moved to

Australia.  Aalison, for her part, testified that the Panteleris family left Australia with the

intention of moving to the United States.

The parties agree that the Panteleris family struggled financially throughout the couple's

marriage.  In Ohio, as in Australia, Aalison worked and Anthimos stayed home and cared for the

children.  Aalison separated from her job in November 2012.  Faced with depleted resources,

Anthimos returned to Australia to obtain work because he was unable to work in the United

States.[3]  Anthimos asserts that the couple agreed that, at the end of the year-long holiday in Ohio,

Aalison and the children would return to Australia.  *Id*.

In December 2, 2012, Anthimos began working after arriving in Australia but was laid off

shortly thereafter.  *Id.* at 6, ¶29.  He stated that he and Aalison agreed the family would delay the

return to Australia until he secured new employment.  *Id*.  Anthimos began working again in May

2013, at which time he stated that he "contacted [Aalison] to let her know about the job and that

he was ready, willing, and able to move the entire family back to their home in Australia."  *Id.* at

---

[3]  At the hearing, Aalison agreed that Anthimos returned to Australia to work to support
their family and also added that Anthimos "was outside of his ninety-day visa waiver and had to
go back under those grounds."

3

(4:14cv477)

¶30.  He asserts that Aalison responded that she and the children would not be returning, and that she had met someone else.  *Id*.

In June 2013, Anthimos contacted International Social Services in Australia, seeking the return of his children to Australia.  *Id*. at ¶31.  In November 2013, he filed applications for the return of his children to Australia under the Hague Convention.  *Id*. at ¶32.  On December 9, 2013, the Australian Central Authority for the Hague Convention referred the matter to the United States Central Authority, which is the United States Department of State, Office of Children's Issues.  *Id*. at ¶33.  On December 23, 2013, United States Department of State sent a "voluntary return letter" to Aalison.  *Id*. at 7, ¶34.  Aalison refused to voluntarily return the children to Australia.  *Id*.

On February 28, 2014, Anthimos filed a verified complaint and petition in the instant court.  He alleges that Aalison violated Article 3 of the Hague Convention by wrongfully retaining the children in Ohio despite his efforts to have the children returned to Australia.  *Id*. at ¶37.  He submits this behavior violates Article 3 because it "is in violation of [his] right of custody under Australian law granting him parental responsibility" of his three children.  *Id*. at 7-8, ¶40.  He further states that, prior to Aalison's alleged wrongful retention of the children, he had exercised his rights of custody with respect to his children and fulfilled his parental responsibilities to his children, which continue to the present time.  *Id*. at 7, ¶36.

Anthimos filed a motion for a preliminary injunction and an expedited hearing.  ECF No. 5.  The parties jointly stipulated to maintain the *status quo* (ECF Nos. 13; 15), and the Court entered an Order, ECF No. 16, granting the motion for preliminary injunction, as stipulated.  The

4

(4:14cv477)

Court held an Expedited Hearing on June 20, 2014.[4]  ECF No. 16.

## II.  Law and Analysis

"The purpose of the Hague Convention is to 'protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence....'" *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007) (quoting the Hague Convention, Preamble).  "The Convention seeks to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II*").  "[T]he Convention should be read to prevent a circumstance where 'the child is taken out of the family and social environment in which its life has developed.'" *Id.* (quoting Elisa Perez–Vera, Explanatory Report ¶ 12, in 3 *Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction* 1069 (1982)).

A federal court has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute.  42 U.S.C.A. § 11601; Hague Convention Article 19; *see also Jenkins v. Jenkins*, 569 F.3d 549, 555 (6th Cir. 2009).  Both Australia and the United States are signatories of the Hague Convention.  *See Feder v. Evans–Feder*, 63 F.3d 217, 221 (3rd Cir. 1995).  Pursuant to the Hague Convention,

---

[4]  The parties had suggested June 5, 2014 and June 26, 2014, as mutually convenient dates for the expedited hearing.  ECF No. 15.  The Court set the hearing for June 5, 2014.  ECF No. 16.  Thereafter, Anthimos was unable to obtain permission to travel to the United States, and, despite best efforts, was unable to appear electronically.  *See* ECF Nos. 21; 24; 25; 26.  The Court held a telephone conference on June 5, 2014, and rescheduled the hearing for June 20, 2014.  By that time, Anthimos was permitted to travel to the United States.  ECF No. 28.

(4:14cv477)

> the removal or the retention of a child is to be considered wrongful where—
>
> a)       it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b)       at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Article 3.

As a "threshold matter," a petitioner must prove, by a preponderance of the evidence, that (1) he was exercising parental custody rights at the time of the removal or wrongful retention, or that he would have exercised his rights but for the removal or wrongful retention, under the law of the children's habitual residence (in this case, Australia); and (2) the respondent removed or retained the child away from their "habitual residence." *See Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*").  If the petitioner meets this burden, the burden shifts to the respondent to show that the case falls within the exceptions provided in the Hague Convention, such that the child should not be returned:

> (1) that the removal proceeding was commenced more than one year after the removal and the child has become settled in the new environment.  Hague Convention, Article 12;
>
> (2) the Petitioner had consented or acquiesced in the removal or retention.  Hague Convention, Article 13a;
>
> (3) there is a grave risk that return of the child would expose the child to physical or psychological harm.  Hague Convention, Article 13b;
>
> (4) returning the child would violate fundamental principles relating to the protection of human rights and fundamental freedoms.  Hague Convention, Article 13b; or
>
> (5) the child objects to being returned and has attained an age and degree of

6

(4:14cv477)

  maturity at which it is appropriate to take account of his or her views.  Hague
  Convention, Article 13b.

*McCurdy v. Shreve-McCurdy*, 806 F.Supp.2d 1010, 1014 (E.D.Mich. 2011) (citing *Friedrich I*,

983 F.2d at 1400); *see also* 42 U.S.C. 11603(e)(2).  The first and second exceptions must be

shown by a preponderance of the evidence; the third, fourth and fifth exceptions must be shown

by clear and convincing evidence.  *Id*.

### A.  The Exercise of Custody Rights

  Anthimos has the burden of proving that he exercised custody rights by a preponderance

of the evidence.  *See Friedrich II*, 78 F.3d at 1064.  "[I]f a person has valid custody rights to a

child under the law of the country of the child's habitual residence, that person cannot fail to

'exercise' those custody rights under the Hague Convention short of acts that constitute clear and

unequivocal abandonment of the child."  *Id*. at 1066.

  In the instant case, Anthimos states that he was exercising custody rights under Australian

law.[5]  Section 111B(4)(a) of the Australian Family Law Act provides in relevant part that "[f]or

the purposes of the [Hague] Convention, each of the parents of a child should be regarded as

having rights of custody in respect of the child . . . ."  Anthimos submits that he acquired parental

responsibility for each of his children by operation of law pursuant to Sections 61C (each of the

parents of a child who is not eighteen has parental responsibility for the child); 69P (presumption

of husband's parentage of wife's child when a child is born to a woman while she is married);

and 69R (presumption of parentage to a person named as a parent in the child's birth certificate)

---

  [5]  At the Hearing, the Court took judicial notice of the Australian Family Law Act and the
Hague Convention.

(4:14cv477)

of the Family Law Act.  ECF No. 1 at 4-5, ¶21.  *See also* ECF No. 1-5 (Family Law Act

provisions).  He further asserts that "[a]t the time of the Children's wrongful retention," he "was

exercising his custody rights and maintaining his relationship with all three of the Children

within the meaning of Articles Three and Five of the Hague Convention."  ECF No. 1 at 5, ¶22.

The Court finds that Anthimos has established by a preponderance of the evidence that he

had custody rights at the time of the alleged wrongful retention, in May 2013.[6]  Moreover,

Anthimos has shown by a preponderance of the evidence that he was exercising those rights at

the time of the wrongful retention.  *See Friedrich II*, 78 F.3d at 1065 (courts should "liberally

find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of

regular contact with his or her child.").  Anthimos regularly communicated with his children

prior to May 2013.  They spoke on the telephone and they used Skype on a regular basis.[7]

Aalison testified that Anthimos did not financially support the children after he returned

to Australia in December 2012 and was not, therefore, exercising his custody rights.  She

admitted, however, that she received two boxes of clothing from Anthimos in January 2013.  She

also acknowledged that they had a joint bank account in Salem, Ohio, and that she had

withdrawn money from that account on four separate occasions in the months after Anthimos had

---

[6]  Aalison challenged the date of the alleged wrongful retention, arguing it occurred, if at all, in December 2012.  For the reasons explained, *supra*, the Court finds that the date of the alleged wrongful retention occurred in May 2013.

[7]  Anthimos testified that prior to May 2013 he spoke to his children daily, and that after May 2013 he spoke to his children using Skype on a weekly basis and had intermittent telephone calls.  Aalison testified that Anthimos consistently maintained contact with the children.  Skype is an electronic service that, *via* the internet, permits voice and video communication, usually free of charge.

(4:14cv477)

returned to Australia.  Aalison withdrew $400.00 on three occasions and $600 or $800 on the

fourth occasion.  After the fourth occasion, Anthimos canceled Aalison's bank card because the

bank informed him of fraudulent activity regarding the joint account.  He further testified that he

informed Aalison that her card had been canceled and that she would have to call the bank to get

a new card issued.  Aalison acknowledged that, even after Anthimos canceled her bank card, she

still had access to their joint bank account in Ohio *via* telephone, in addition to geographical

proximity to the bank.  She did not attempt to procure a new bank card.

Aalison also testified that Anthimos advised that he would cover family expenses if she

provided him with a bill, or that he would reimburse her if she provided a receipt.  There was no

testimony that Aalison ever provided a bill or receipt to Anthimos that he refused to pay.  The

Court does not find that the offered testimony regarding banking transactions, or lack thereof,

resulted in Anthimos failing to exercise custody rights.  *See id*. at 1066 (explaining that, once a

person is found to have valid custody rights by law, "that person cannot fail to 'exercise' those

custody rights under the Hague Convention short of acts that constitute clear and unequivocal

abandonment of the child.").

Finally, Aalison challenges Anthimos's failure to visit the children in person, or to

purchase plane tickets for the children to fly to Australia.  The record is replete with Anthimos's

well-documented visa difficulties and references to the poor financial situation of the Panteleris

family.  It follows that the family members could ill afford airline tickets to Australia, and the

three children, one of whom is autistic and the eldest of whom is now seven, could not safely fly

unaccompanied.  Moreover, had Anthimos traveled to the United States to visit his children, it

(4:14cv477)

could now be argued against him as evidence of his consent to the children residing permanently in Ohio.

Accordingly, the Court finds that Anthimos has shown, by a preponderance of the evidence, that he had custody rights and was validly exercising those rights at the time of the alleged wrongful retention. *See id*. ("Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly.").

**B. Habitual Residence**

Anthimos also has the burden of proving by a preponderance of the evidence that Aalison retained the children away from their habitual residence. *See Friedrich I*, 983 F.2d at 1400. When analyzing this, courts looks to the time just prior to the alleged wrongful retention— in this case, May 2013. *Id*. at 1401. "In *Friedrich I*, the Sixth Circuit set out five principles a Court considers in determining the habitual residence:

> First, habitual residence should not be determined through the "technical" rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case. Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry. Fourth, a person can have only one habitual residence. Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence. (Internal citations, quotation marks and alterations omitted.)

*Robert*, 507 F.3d at 989 (citing *Friedrich I*). In *Robert*, the Sixth Circuit borrowed from the Third Circuit's decision in *Feder* to build upon the rule established in *Friedrich I*, to hold that "a

10

(4:14cv477)

child's habitual residence is the nation where [] the child has been present long enough to allow

acclimatization, and where this presence has a 'degree of settled purpose from the child's

perspective.'" *Id.* (citing *Feder*, 63 F.3d at 224).  The *Robert* Court explicitly rejected the Ninth

Circuit's standard established in *Mozes v. Mozes*, 239 F.3d 1067 (2001) that considers the

subjective intent of the parents.  *Robert*, 507 F.3d at 990-992.

In *Jenkins*, the Sixth Circuit described several factors it adopted from the Third Circuit's

opinion in *Karkkainen v. Kovalchuk*, 445 F.3d 280 (3d Cir. 2006) to consider when determining

a child's habitual residence:

> [T]he Third Circuit held that academic activities are among the most central ... in
> a child's life and therefore highly suggestive of acclimatization.  The court also
> noted that social engagements, participation in sports programs and excursions,
> and meaningful connections with the people and places in the child's [] country
> all point to the child being acclimatized. Additionally, the court held that the fact
> that [the child] brought more personal belongings with her than usual, in
> anticipation that she would remain [in the United States] was evidence of a settled
> purpose to reside in the United States.

*Jenkins*, 569 F.3d at 556 (quoting *Robert*, 507 F.3d at 996).

In the instant case, Anthimos argues that "[b]efore the events that give rise to this Petition

occurred, Petitioner, Respondent, and their Children lived together in Australia for five years.

The oldest of the children [] was enrolled in kindergarten in Australia, and all three Children

actively participated in various activities offered by Australian life."  ECF No. 1 at 3, ¶15.  At the

Hearing, Anthimos testified that the two older children went to parks daily, participated in play

groups, visited the aquarium and the zoo, the botanical gardens, and various state and national

parks.  He submitted photographs of B.P. and H.P. playing at parks and playing with goats the

Panteleris family had for a time.

11

(4:14cv477)

The eldest child, B.P., was enrolled in "kindergarten," which, in Australia, appears to be similar to nursery school in the United States.  He was also part of two play groups, one for over a year.  Anthimos would take the second child, H.P., to B.P.'s school for parent volunteer days.  H.P. has moderate to severe autism.  He was diagnosed in Australia, and had been seeing doctors there for referrals to specialists, although he had not yet commenced treatment there.  The youngest child, Z.P., was four months old when the family left Australia, and was present during the family activities or otherwise placed with family or friends.

Anthimos testified that he has five brothers and sisters living in the Melbourne or Sydney area.  He further testified that, when he was in the United States, the children communicated with family members *via* Skype on a weekly basis.  When the Panteleris family was living in Australia, they lived for a year with Anthimos's grandmother, in her home, and spent time interacting with family and friends.  He submitted photographs of B.P. and H.P. interacting with friends in Australia.  The Court finds that Anthimos has sufficiently presented evidence showing that the children participated in school, when applicable; social engagements; excursions; and meaningful connections with the people and places in Australia.  *See Robert*, 507 F.3d at 996.

Aalison presented testimony that Anthimos's family in Australia is not close, and that the children did not see them much.  She agreed, however, that the children saw family members.  She also agreed that the children had experiences in Australia and that B.P. has memories of Australia.[8]  In support of her assertion that the children's habitual residence was in Ohio, Aalison

---

[8] Aalison testified that Antimos's family are Jehovah's Witnesses, and do not celebrate holidays or birthdays.

12

(4:14cv477)

referred to the boys' schooling and H.P.'s therapy—she did not delineate, however, between the time period before the alleged wrongful retention, in May 2013, and the time period after the alleged wrongful retention until the present.

The Court can not accept evidence of schooling and therapy that occurred after May 2013 to establish habitual residence.  *See* *Friedrich I*, 983 F.2d at 1401 (stating "habitual residence pertains to customary residence prior to removal.  The court must look back in time, not forward.").  The record establishes that in May 2013 the children had been living in Ohio for approximately thirteen months.  Aalison and Anthimos testified that, during the relevant time period in Ohio, B.P. was enrolled in kindergarten and H.P. was enrolled in pre-school, and underwent therapy that the school provided.  There was testimony that the children had a relationship with Aalison's sister and mother, whom both lived nearby.

A court also considers whether the children brought more personal belongings with them than usual, in anticipation that they would remain in the United States as evidence of a settled purpose to reside here.  *See* *Robert*, 507 F.3d at 996.  The only special belongings Aalison identified was a blanket that B.P. was attached to and a bear that H.P. was attached to, from his grandmother, that the Panteleris family took to the United States.  The Court finds that it would not have been unusual for the parents to have brought these items to Ohio for the children to have during a year-long stay.

Anthimos testified the family left the children's cot and a bassinet, and submitted a photograph of a bassinet that Aalison recognized.  Anthimos submitted a photograph of a toy fire truck that Aalison did not recognize specifically, but testified that the children did have fire

13

(4:14cv477)

trucks.  Anthimos submitted a photograph of stuffed animals and a hat, and, although Aalison

testified that she did not recognize the stuffed animals, she did recognize the hat.  She testified

that it belonged to Anthimos and that B.P. would wear it occasionally.

Considering all the evidence, the Court finds that Anthimos has established by a

preponderance of the evidence that, from the perspective the children, the habitual residence of

the children is in Australia.[9]  *See* _id_. at 989.  Because Anthimos has met both elements as

required under the Hague Convention, the Court finds that Aalison wrongfully retained the

children in the United States.

### C.  Exceptions or Defenses to Return of the Children

Aalison argues that, even if the Court finds wrongful retention, she can meet her burden

showing the following exceptions: that the proceeding was commenced more than one year after

the wrongful retention and the children have become well settled in the new environment;

Anthimos consented or acquiesced in the retention; and there is a grave risk that return of the

children would expose the children to physical or psychological harm.  *See* Hague Convention,

Article 12; 13a; 13b.  The Court considers each in turn.

#### 1.  The Timeliness of the Petition

Aalison argues that Anthimos filed his petition for the return of the children more than

one year after the date of wrongful retention and that the children have become settled in the

---

[9]  At the Hearing, Aalison urged the Court to consider the intent of the parents when
determining the habitual residence of the children.  The Sixth Circuit has expressly rejected
parental intent as a factor to consider.  *See Robert*, 507 F.3d at 990-992.  In any event, the
evidence submitted as to the intent of the parents favors Anthimos's version— that the parties
intended to stay in Ohio for one year.

(4:14cv477)

United States.  *See* Hague Convention, Article 12.  Aalison wrongfully retained the children in the United States when she refused to send the children back to Australia.  Anthimos testified that Aalison advised she would not return the children in May 2013.  He filed the petition less than one year later, on February 28, 2014.

Aalison contends that Anthimos knew that she was not returning to Australia with the children when he left the United States in December 2012.  She also testified that she never specifically told him the children were not coming back to Australia because the plan was for them to live in the Untied States.  She testified that, "at the end, when I did say that I wanted the divorce, he started to push the point of he wanted us to come back there."  This is consistent with Anthimos's testimony that in May 2013 Aalison advised the children would not be returning to Australia.

Aalison alternatively argues that she told Anthimos that their marriage was over "at the end of" February or March, 2013, and that he knew at that time that the children were not coming back to Australia.  Telling Anthimos the marriage was over, however, does not necessarily constitute a refusal to return the children.  Even if, however, telling Anthimos that their marriage was over did constitute a refusal to return the children to Australia, Aalison testified that she does not remember the exact date of that conversation, but that she believed it occurred in late February or early March, 2013.  Without evidence that the conversation took place before February 28, 2013, Aalison cannot establish by a preponderance of the evidence that the petition

15

(4:14cv477)

is untimely.[10]  Accordingly, the Court finds that the date of the wrongful retention was May 2013, and the petition is timely because it was filed February 28, 2014, less than one year from the date of wrongful retention.  Because the Court finds that the petition was timely, evidence from the last two years suggesting that the children are well settled in the United States is inapplicable.[11]

### 2.  Consent or Acquiescence

Aalison submits that Anthimos consented or acquiesced to the children living in the United States.  *See* Hague Convention, Article 13a.  It is undisputed that Anthimos consented to the children living in the United States from the time of the Panteleris family's arrival in early 2012 until May 2013.  Consenting to a year-long visit, however, does not equal consenting or acquiescing to the children living in the United States permanently.  The record supports Anthimos's testimony that shortly after he was told, in May 2013, that the children would not be returning to Australia, he began proceedings with International Social Services in Australia to seek a return of the children.

---

[10]  Anthimos also submitted into evidence business records of "Wraparound," which a Wraparound representative described as a county-sponsored in-home program of coordination to obtain services for families.  The March 5, 2013 and April 29, 2013 Wraparound records state that Aalison "has made the decision to leave Michael."  The May 14, 2013 record states that Aalison "has contacted legal[] aid about divorcing Michael."  While not alone dispositive, this evidence supports the finding that Aalison informed Anthimos of her intention to retain the children no earlier than the end of February 2014, making the petition timely.

[11]  *See, e.g., McCurdy*, 806 F.Supp.2d at 1022) ("Under the express terms of the Hague Convention, however, the well-settled defense is only available to a Respondent in instances where the removal proceeding was "commenced more than one year after the removal." *Id*. Here, the removal occurred on September 7, 2010, and the Petition was filed on March 11, 2011. Thus, the removal proceeding was not commenced more than one year after the removal and the well-settled defense does not apply here.")

(4:14cv477)

Aalison argues that Anthimos consented to the children living in the United States permanently when the family arrived in early 2012.  She describes the following as proof: the couple entered into a one-year lease; Anthimos's name appeared on the utility bill; the couple purchased a vehicle; the couple signed up for government benefits; the couple enrolled B.P. in school; Anthimos began the process to apply for a permanent visa; the couple planned on purchasing a house; an email in which Anthimos allegedly referred to Ohio as "home"; and an email that Anthimos contemplated settling in Ohio.

Anthimos testified that he and Aalison had planned to stay in Ohio for one year. Therefore, entering into a year-long lease is not indicative of a permanent relocation, particularly given Aalison's testimony that the landlord did not offer a month-to-month lease option.  That Anthimos's name appeared on the utility bill is not indicative of anything more than a willingness to be responsible for payment.  Purchasing a vehicle for a year-long stay was reasonably explained by Anthimos, whom testified that they would sell the car when they returned to Australia.  An email he sent to Aalison on May 7, 2013—shortly before the wrongful retention—references selling the car.  A family struggling financially that is eligible for and signs up to receive government benefits so as to obtain assistance is not unusual or indicative of an intent or consent to remain in Ohio permanently.  Enrolling the eldest child in school so that he may continue to receive an education is responsible parenting and mimics Anthimos's childhood experience.  He testified that when he was four years old, his family spent time in Greece and Europe for one year, and that he was enrolled in school during that time.

When Anthimos was asked why the couple began the process to obtain a permanent visa

17

(4:14cv477)

for him if he only intended to remain in the United States for one year, he explained that

permanent residency would provide him with a work permit and simplify the process of visiting

family.  He described that without a permanent visa he could only stay three months under the

visa waiver program.  This explanation is reasonable and does not undermine Anthimos's

assertion that he did not consent or acquiesce to the children permanently residing in the United

States.

That the couple may have planned to purchase a house sometime in the future does not

suggest an intent or consent to remain permanently, during the time period at issue.  Witnesses

whom testified that Anthimos was interested in purchasing a house and installing an elaborate

garden provided no time-line for his intent.[12]  Anthimos testified that the couple was interested in

purchasing a home and had considered many options, including an investment property in Salem,

Ohio.  This does not imply consent or acquiescence for the children to reside permanently in

Ohio.

In a May 7, 2013 email, Anthimos wrote to Aalison that he missed "being home."  He

testified that "home" in that email referenced Australia.  The email does not resist such an

reading.  Finally, Anthimos expressed in a July 23, 2013 email that "reconciliation could see me

settle in Ohio, and as I have said to you prior to this, I am not geographically bound."  This does

not demonstrate consent to having their children reside in Ohio.  Rather, it more strongly

---

[12]  One neighbor testified that she thought Anthimos's ambition to have a garden at his
home meant that he planned to remain permanently in the United States.  Interestingly, this same
neighbor testified that she gardened at a home she rented, in obvious contradiction to her belief
that gardening evinces permanency.

18

(4:14cv477)

demonstrates that Anthimos intended to live in Australia, and that he would be open to living in

Ohio, if he and Aalison reconciled.[13]  The writing does not convey that, in the past, Anthimos had

consented to permanently living in Ohio, or, at that time or some earlier time, had consented to

the children permanently living in Ohio.

In sum, Aalison has not shown by a preponderance of the evidence that Anthimos

consented or acquiesced in the retention of the children in Ohio.

### 3.  Grave Risk of Harm

Aalison argues that there is a grave risk that returning the children would expose them to

physical or psychological harm.  *See* Hague Convention, Article 13b.  In support, Aalison

presented testimony by a neighbor, Josiah Deeter.  Deeter testified that when Anthimos was

alone with the children during the day, H.P., who was described by more than one witness as a

"runner," would bolt out of the house.  Deeter testified that she had seen H.P. run out into the

street, and that she had found him playing inside of the cars belonging to her and her husband

that were parked in her driveway.  Aalison's sister, Aarika Denton, testified that she once saw

Anthimos pull H.P. by the hair to "pull him back" on one occasion when H.P. was walking by, a

prelude to his bolting outside.  She testified that H.P. "cried out in pain" but that there was no

bleeding.  She also testified that she would sometimes go to the house and find the children

"running everywhere" and that Z.P. needed her diaper changed.  Denton testified that she did not

---

[13]  Anthimos testified that at that time he still believed reconciliation with Aalison was a possibility.

(4:14cv477)

think Anthimos was able to give the children the amount of attention they needed.[14]

Courts interpret the grave risk exception narrowly. *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (finding the "grave risk" exception is to be interpreted narrowly, lest it swallow the rule.") (citations omitted). Examples of grave risk include spousal beatings in the child's presence and child abuse. *Id.* at 605 (citing cases). H.P. was never injured on the occasions that he ran out of the house. One instance of hair-pulling does not illustrate that Anthimos is abusive. Three children under the age of six or seven "running around" and an overripe diaper may aptly describe many living rooms in which a stay at home parent is to be found. There was no testimony demonstrating a grave risk to the children. The Court finds that Aalison has not shown, by clear and convincing evidence, that there is a grave risk of harm to the children if they are returned to Anthimos in Australia.

### III. Conclusion

For the reasons above, the Court issues the following Orders:

1. Petitioner Anthimos Panteleris's Petition for the Return of the Children is GRANTED.

2. The Petitioner and Respondent's three minor children shall be returned to Australia. Within three (3) days of this Order, Petitioner shall file with the Court a suggested date and manner for their return.

---

[14] Rendering a decision based on Petitioner's attention to the children or concern for H.P.'s well being would be wading "dangerously close to forbidden territory: the merits of the custody dispute." *Friedrich II*, 78 F.3d at 1065.

(4:14cv477)

     3.  Respondent shall not remove the three minor children from the Northern District of

Ohio pending their return to Australia.

     IT IS SO ORDERED.


 July 7, 2014                              */s/ Benita Y. Pearson*
Date                                       Benita Y. Pearson
                                         United States District Judge